UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

PATRICIA L. TIMMINS,
Acting Regional Director of the
Eleventh Region of the National
Labor Relations Board, for and
on behalf of the NATIONAL LABOR
RELATIONS BOARD,



        Petitioner,

    v.                                        ACTION NO. 2:08cv189

NARRICOT INDUSTRIES, L.P.,

        Respondent.

            MEMORANDUM OPINION AND ORDER

    This matter comes before the court on a petition for injunctive relief, filed by Patricia L. Timmins ("petitioner"), Acting Regional Director of the Eleventh Region of the National Labor Relations Board (the "Board"). The petition was filed pursuant to § 10(j) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(j).[1] For the reasons set forth below, the

---

[1] After a complaint alleging unfair labor practices has been issued by the Board, § 10(j) of the Act authorizes the Board to petition a district court for appropriate injunctive relief. See 29 U.S.C. § 160(j). Upon the filing of the petition and service of notice to the employer, the court has jurisdiction "to grant to the Board such temporary relief or restraining order as it deems just and proper." Id. Section 10(j) is one of only two provisions in the Act which serves as an exception to the general rule that district courts lack jurisdiction over unfair labor complaints. See, e.g., Miller ex rel. NLRB v. Cal. Pac. Med. Ctr, 19 F.3d 449, 458 (9th Cir. 1994) (en banc); see also infra note 11. Cf. generally Muniz v. Hoffman, 422 U.S. 454, 460-63 (1975) (discussing the legislative history of the Act and noting the limited

petition for injunctive relief is **DENIED**.

## I. Factual and Procedural History

Narricot Industries, L.P. ("Narricot"), is a limited partnership registered in Georgia, with an office and places of business in Boykins, Virginia, and Murfreesboro, North Carolina. It is engaged in the manufacture of woven narrow fabrics, including seatbelt webbing.[2] Since June 23, 1976, the United Brotherhood of Carpenters and Joiners of America Industrial Council, Local No. 2316 (the "Union") has been the exclusive collective bargaining representative of the relevant bargaining unit (the "unit").[3] On July 20, 2007, the Union requested that Narricot bargain collectively for a successor contract to the contract which was to expire on October 2, 2007. The Union and Narricot met on five separate occasions during the period between July 20, 2007, and September 26, 2007. On September 29, 2007, Narricot notified the Union that it was withdrawing recognition from the Union as of October 2, 2007, because a majority (212 out of 329, which is

---

jurisdiction of the federal courts in the context of unfair labor disputes).

[2] Narricot is an employer engaged in commerce within the meaning of the Act. See 29 U.S.C. § 152(2), (6), and (7).

[3] The unit consists of all production, maintenance, and plant clerical employees at Narricot's Boykins, Virginia, facility, to include its operation at Murfreesboro, North Carolina; excluding all office clerical employees, professional and technical employees, guards, truck drivers, and supervisors, as defined by the Act. See 29 U.S.C. § 159(b).

2

sixty-four percent) of the unit employees had signed a petition stating that they no longer wished to be represented by the Union.

The petition in question originated in July or August of 2007, when Henry Vaughan ("Vaughan"), who holds the title of "Lead Packer" and has been employed with Narricot for over thirteen years, approached Kris Potter ("Potter"), Narricot's Human Resources Director, and asked Potter how Vaughan and the other employees could remove the Union.   Discussions among employees about removing the Union had been taking place for almost a year prior to the time that Vaughan approached Potter.   (Administrative Hr'g Tr. 525-526.)[4]   Potter provided Vaughan with a blank petition for employees to sign and information concerning the number of signatures needed in order for the employees to remove the Union. (Tr. 526-27.)   At some point during this same time period, Shirley Mae Lewis ("Lewis"), an employee in the Separation Department, who has been employed at the Boykins plant for over twenty-four years, also approached Potter and asked for a petition.   (Tr. 489-91.) Vaughan, Lewis, and at least four other employees began to solicit

---

[4]    During the proceeding before the Administrative Law Judge ("ALJ"), the parties stipulated to the fact that, as of June 30, 2007, only twenty-four percent of the employees in the bargaining unit were members of the Union, which membership was down from forty-five percent on June 30, 2005.   Vaughan, Shirley Mae Lewis ("Lewis"), and Shelton McGee ("McGee") testified that they and others felt the Union "did nothing" for them.   (Tr. 181, 184, 491-92, 529-30.)   Prior to the withdrawal of recognition, the unit employees had not received a wage increase since October 1, 2003, for which they blamed the Union.   (E.g., Tr. 270-71.)

3

employees to sign the petition.   (Tr. 536.)   Vaughan would then submit the signatures to Potter.

The petitioner contends, however, that during the months of July, August, and September, 2007, Narricot engaged in the following conduct in violation of the Act: Narricot (1) promised its employees increased benefits if they removed the Union as their bargaining representative; (2) solicited employees to sign the petition to remove the Union and/or to withdraw from membership in the Union and to revoke their authorizations for dues checkoff; and (3) provided unlawful assistance to employees in the creation and circulation of the decertification petition.     See 29 U.S.C. § 158(a)(1).[5]   The petitioner also claims that (4) Narricot unlawfully withdrew recognition from the Union and refused to recognize and bargain collectively in good faith with the Union; and (5) Narricot unilaterally implemented changes to the wages, holidays, overtime premiums, health and welfare benefit plans, and 401(k) retirement plans, without notice to, or bargaining with, the

---

[5] Section 8(a)(1) of the Act states: "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [of the Act]." 29 U.S.C. § 158(a)(1).  Section 7 of the Act provides, in relevant part:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities . . . .

29 U.S.C. § 157.

4

Union,[6] in violation of the Act. See 29 U.S.C. § 158(a)(5).[7]

The Union filed several charges of unfair labor practices with the Board, which were ultimately transferred to the Eleventh Region and consolidated. Based on the Union's charges, the Regional Director issued a complaint against Narricot; this began the administrative adjudicatory process. A hearing before Administrative Law Judge Margaret Guill Brakebusch ("ALJ") took place on February 26, 27, and 28, 2008, in Jackson, North Carolina. On May 6, 2008, the ALJ issued her report and recommendation ("Decision") to the Board. At this stage in the proceeding, objections and responses either have been or will be filed with the Board. The Board will then issue a final decision on the merits of the underlying case.

On April 22, 2008, the petitioner filed the instant petition

---

[6] After Narricot withdrew recognition from the Union, it implemented a wage increase for over ninety percent of its employees and eliminated the double overtime premium pay. Narricot also made changes to its various employee benefit plans, including: improving the company match formula in the 401(k) plan, introducing a new medical insurance plan with more in-network providers and more enrollment flexibility, expanding the short-term disability plan, and adding a long-term disability plan. Narricot also modified and reconfigured job duties in order to improve productivity; no employee lost his or her job as a result of these changes. All of this was done without notifying or bargaining with the Union.

[7] Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees . . . ." 29 U.S.C. § 158(a)(5).

for an injunction.[8]  The petitioner asks the court for injunctive relief ordering Narricot to do the following: refrain from any of the unlawful conduct with which it is charged; recognize and bargain with the Union; upon request of the Union, rescind any or all of the unilateral changes which were implemented after recognition was withdrawn from the Union; and post copies of any order granting injunctive relief at all locations where notices to employees are customarily posted.  On April 22, 2008, the petitioner also filed a motion to hear the petition on the basis of the administrative record.

On May 21, 2008, Narricot filed a response in opposition to the petition, a response in opposition to the motion to hear the petition on the basis of the administrative record, and a motion to dismiss the petition.  On June 4, 2008, Lewis and Vaughan (together, the "employee intervenors"), the Narricot employees who initiated the employee effort to remove the Union, filed a motion to intervene in this action in opposition to the petition for injunctive relief.

---

[8] On June 27, 2008, the petitioner filed a motion for leave to amend the petition in order to correct certain typographical errors and to conform it to the ALJ's Decision, which was issued shortly after the petition for injunctive relief was filed in this court. The petitioner's motion is **GRANTED**.   No further response from Narricot is necessary, as the amendments to the petition do not make any significant changes to the petition, except removal of the allegations involving matters where the ALJ found against the Board.   Therefore, Narricot's response, filed on May 21, 2008, is considered in response to the petition, as amended.   Moreover, the petition, as amended, is referred to herein as the "petition."

The court held a hearing on these matters on June 20, 2008. At the hearing, the court denied Narricot's motion to dismiss the petition, denied in part and granted in part the petitioner's motion to hear the petition on the basis of the administrative record,[9] granted the employee intervenors' motion to intervene, and took the petition for injunctive relief under advisement. This Memorandum Opinion and Order addresses only the petition for injunctive relief, which is the only remaining matter for the court's determination.

## II. Standard of Review

Once a complaint alleging unfair labor practices has been issued by the Board, section 10(j) of the Act authorizes the Board to petition a district court for appropriate injunctive relief. See 29 U.S.C. § 160(j). Upon the filing of the petition and the service of notice on Narricot, the court has jurisdiction "to grant to the Board such temporary relief or restraining order as it deems just and proper." Id. This provision is in place as a recognition by Congress of the fact that the remedial purposes of the Act may be frustrated because Board proceedings and ultimate enforcement by a court of appeals involve a lengthy process, and therefore it is necessary to preserve or restore the status quo which existed prior to the alleged unfair labor practice. See S. Rep. No. 105, 80th Cong., 1st Sess. 8, 27 (1947); NLRB v. Aerovox Corp., 389 F.2d 475,

---

[9] See infra note 16 and accompanying text.

7

477 (4th Cir. 1967). Essentially, once an unlawful employment practice has taken place, the passage of time may render a final enforcement order ineffectual. See S. Rep. No. 105, 80th Cong., 1st Sess. 8, 27 (1947); Aerovox, 389 F.2d at 477. Injunctive relief under § 10(j) is an extraordinary remedy. See, e.g., Clark v. Fieldcrest Cannon, Inc., No. 4:94 CV 00308, 1994 WL 1027520, at *4 (M.D.N.C. Aug. 25, 1994) (unpublished) (citing cases).

The appropriate standard of review applicable to a § 10(j) proceeding is in somewhat of a state of flux in the federal courts. The conventional approach involves a two-part inquiry known as the "reasonable cause/just and proper" determination. This standard was established in this circuit in Aerovox, 389 F.2d at 477.[10] Under this two-step approach, the district court first asks whether there is reasonable cause to believe the Act has been violated. Id. At this stage, the court does not decide the merits of the underlying case, see D'Amico v. Cox Creek Ref. Co., 719 F. Supp. 403, 407 (D. Md. 1989), and a full evidentiary hearing is not required. See Gottfried v. Frankel, 818 F.2d 485, 493 (6th Cir. 1987). While the court defers to the Board on both its view of the evidence and its conclusions of law, see Cox Creek, 719 F. Supp. at

---

[10] Aerovox was a proceeding under § 10(e) of the Act, and not a § 10(j) proceeding. However, in that case, the court applied the then-prevailing § 10(j) reasonable cause/just and proper standard to the § 10(e) proceeding; and Aerovox has been generally cited as the authoritative § 10(j) standard in the Fourth Circuit since 1967. See, e.g., Fieldcrest Cannon, 1994 WL 1027520, at *3.

407, the court is still required to conduct its own independent review, and may not simply "rubberstamp" the petitioner's position. See id.[11]

If the court finds that there is reasonable cause to believe the Act has been violated, then the second step of the inquiry involves a determination of whether injunctive relief is "just and proper." Aerovox, 389 F.2d at 477.   At this second step, injunctive relief is just and proper if necessary to "restore the pre-violation status quo, serve the public interest, and further the remedial purposes of the [A]ct." D'Amico v. Townsend Culinary, 22 F. Supp. 2d 480, 484-85 (D. Md. 1998) (citing Aerovox, 389 F.2d at 477).

There has been a movement in the courts of appeals away from

---

[11] The role of the federal courts is somewhat unusual in the context of the Act, in that, with the exception of § 10(j) and (l), district courts lack jurisdiction over unfair labor complaints, and, although the courts of appeals have appellate jurisdiction over final Board decisions, the scope of this review is limited and deferential.  See 29 U.S.C. § 160(e)-(l); Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 216 (1964).   However, as the Ninth Circuit noted, in a § 10(j) proceeding, the role of the district court is not simply to sign off on any and all requests made by the Board:

> Even though § 10(j) is an exception to the primary jurisdiction of the NLRB over labor disputes, it reflects an intention that the district court will exercise judgment rather than simply sign off on Board requests. Otherwise, jurisdiction for the court to grant such relief "as it deems just and proper" would be unnecessary. Also, it is the courts of appeals which are obliged to afford deferential review to final Board determinations, not the district courts in response to preliminary requests.

Cal. Pac. Med. Ctr., 19 F.3d at 458 (emphasis in original).

the reasonable cause/just and proper standard toward the traditional equitable standard for granting a preliminary injunction under Federal Rule of Civil Procedure 65.[12] The reasonable cause/just and proper standard has been entirely abandoned by the Seventh, Eighth, and Ninth Circuits. See Sharp v. Parents in Cmty. Action, Inc., 172 F.3d 1034, 1037-39 (8th Cir. 1999); Miller ex rel. NLRB v. Cal. Pac. Med. Ctr, 19 F.3d 449, 458 (9th Cir. 1994) (en banc); Kinney v. Pioneer Press, 881 F.2d 485, 489-93 (7th Cir. 1989). The First and Second Circuits have retained the "reasonable cause" prong, but apply the traditional equitable criteria when addressing the "just and proper" prong. See, e.g., Pye ex rel. NLRB v. Sullivan Bros. Printers, Inc., 38 F.3d 58, 64 & n.7 (1st Cir. 1994); Silverman v. 40-41 Realty Assocs., 668 F.2d 678, 680 (2d Cir. 1982).

The Fourth Circuit has yet to revisit the reasonable cause/just and proper standard.[13] However, two district courts in

---

[12] The approach under Rule 65 involves a four-part inquiry. First, the court engages in a "balancing of the hardships." At this stage, the court balances: (1) the likelihood of irreparable harm to the petitioner if the petition is denied, against (2) the likelihood of harm to the respondent if the petition is granted. See Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 193-96 (4th Cir. 1977). The court then considers: (3) the petitioner's likelihood of success on the merits, and (4) the public interest. See id. As the balance of harm moves in favor of the defendant, the plaintiff has a greater burden of showing its likelihood of success on the merits. See id.

[13] While there is no more recent authority from the Fourth Circuit, the portion of Aerovox which held that the government is not required to show irreparable injury when seeking an injunction

the circuit have addressed the reasonable cause/just and proper standard in the wake of the shift by other circuit courts away from it in favor of the traditional equitable approach to requests for injunctive relief. See generally Townsend Culinary, 22 F. Supp. 2d 480; Fieldcrest Cannon, 1994 WL 1027520.[14]

In the absence of a Fourth Circuit mandate directing otherwise, this court will apply the reasonable cause/just and proper standard, which remains in effect in this circuit. However, to the extent that a consideration of the traditional equitable criteria is necessary in order to determine whether injunctive relief is "just and proper," it is appropriate for the court to consider them. See Townsend Culinary, 22 F. Supp. 2d at 486. Throughout the inquiry, this court will also keep the purposes of

---

has been called into serious doubt by the Supreme Court's decision in Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-20 (1982). The Court in Weinberger held that, absent clear congressional intent to limit the equitable discretion of the courts, district courts are permitted to exercise traditional equitable discretion in deciding whether to grant injunctive relief under a federal statute. Id. Several circuit courts which have moved away from or rejected the reasonable cause/just and proper standard have relied on Weinberger as justification for so doing. See, e.g., Parents in Cmty. Action, 172 F.3d at 1038 (8th Cir. 1999); Cal. Pac. Med. Ctr., 19 F.3d at 456 (9th Cir. 1994); Pioneer Press, 881 F.2d at 490-91 (7th Cir. 1989).

[14] In Townsend Culinary, after discussing the movement away from the reasonable cause/just and proper standard, and noting the Fourth Circuit's silence on the issue, the court determined that the reasonable cause/just and proper standard was appropriate, but stated that it would apply traditional equitable principles in making the "just and proper" determination. See 22 F. Supp. 2d at 486.

the Act in mind[15] and afford appropriate deference to the petitioner's position and the ALJ's factual findings.   See Silverman v. J.R.L. Food Corp., 196 F.3d 334, 337-38 (2d Cir. 1999) (per curiam); cf. Humphrey ex rel. NLRB v. Int'l Longshoremen's Ass'n, 548 F.2d 494, 498 (4th Cir. 1977) (noting, in a § 10(*l*) proceeding, that the Board's position should be afforded "considerable deference").[16]

### III. Analysis

#### A. Reasonable Cause

Based on the evidence in the record before this court, there is reasonable cause to believe that Narricot violated the Act.  The strongest evidence to support this finding is the conduct of Potter, who provided more than a "ministerial role" in the

---

[15] Even those courts which have rejected the reasonable cause/just and proper standard in favor of the traditional equitable approach have cautioned that the traditional equity criteria must be analyzed "through the prism of the underlying purpose of § 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." Cal. Pac. Med. Ctr., 19 F.3d at 459-60.

[16] Disagreement as to the proper standard of review was the basis of Narricot's response in opposition to the petitioner's motion to hear the petition on the basis of the administrative record.   At the hearing on June 20, 2008, the court granted the petitioner's motion to the extent that the court found that it was not necessary to re-hear the evidence which was presented at the three-day hearing before the ALJ; however, the motion was denied to the extent that the court determined that limited additional evidence, including, specifically, the joint affidavit of Kris Potter, Ed Hull, and Julie Bennett, was necessary to determine whether injunctive relief is just and proper.

decertification petition, at least with respect to the activity of Anja Baumann ("Baumann"), a quality control intern. See, e.g., Times-Herald, Inc., 253 N.L.R.B. 524, 524 (1980) (noting that the relevant test is whether the employer's conduct "constitutes more than ministerial aid").

The ALJ found that Potter gave Baumann a list of employees from whom to solicit signatures.[17] (Decision at 17.) Baumann then engaged in a rather extensive effort to solicit signatures, sometimes during working hours, by, inter alia, telling employees that they would receive raises if they got rid of the Union. Potter also provided Baumann with health insurance information which she used to demonstrate to employees that they would receive better health insurance without the Union. Baumann would submit the signatures she collected to Potter, who would then tell her how many more signatures were needed. The ALJ found that Potter violated the Act through his conduct and that Baumann acted as an agent of Narricot when she solicited employees to sign the petition. (Decision at 18, 24.)[18]

The court will defer to the ALJ's conclusion that Potter gave more than "ministerial assistance" to Baumann with regard to her

---

[17] However, both Baumann and Potter testified that Baumann requested the list. (Tr. 40, 150.)

[18] Because an employer cannot get an agent to do what it could not itself do, the ALJ found that Narricot, through Baumann, violated § 8(a)(1) of the Act when Baumann solicited employees to sign the petition. (See Decision at 21-24.)

13

decertification effort.  (See Decision at 18.)  The ALJ was able to view the witnesses firsthand, and was in a more appropriate position to assess their credibility than is this court. Accordingly, the court finds that Potter's role in the decertification effort, with respect to Baumann, was more than ministerial, and was thus in violation of the Act.  See, e.g., Condon Transp., Inc., 211 N.L.R.B. 297, 300-03 (1974).  This conclusion is based on Potter's provision of an employee list to Baumann, as well as his provision of materials regarding the availability of insurance benefits if the Union were not the collective bargaining representative, and Baumann's testimony that when she returned the signed petition forms to Potter at the end of each day, he responded by saying "good," or by telling her that more signatures were needed.[19]

The ALJ also found that Narricot violated the Act in several additional ways.[20]  After a review of the record below, the court finds that several of the ALJ's findings also provide reasonable cause to believe that Narricot has violated the Act. Specifically, in response to requests from several employees as to how they could

_____

[19]  The court also agrees with the ALJ's conclusion that Potter unlawfully solicited Edna Worrell ("Worrell") to resign her membership in the Union.  (Decision at 13.)  Potter approached Worrell about resigning from the Union shortly after Worrell asked Vaughan about how she might get out of the Union.  (Tr. 278-79.)

[20] However, the ALJ did not find that every violation alleged in the complaint was factually supported.

14

resign their membership in the Union, Narricot prepared letters for the employees to sign which revoked authorization of Union dues and fees. These letters were presented to the employees by Supervisor Tim Beals ("Beals").[21] The court agrees with the ALJ's conclusion that Narricot's responses went beyond ministerial aid when presented with employee inquiries as to how to withdraw from the Union.[22] See Am. Linen Supply Co., 297 N.L.R.B. 137, 138 (1989), enforced, 945 F.2d 1428 (8th Cir. 1991). In addition, the ALJ found that by permitting Shelton McGee ("McGee") to place a copy of the petition in a supervisor's office, for the convenience of those employees who wished to sign it, Supervisor Eric Hayes ("Hayes") violated the Act by tacitly facilitating the decertification effort. (Decision at 18-20.)[23] The court finds that Hayes's behavior provides additional reasonable cause to believe the Act has been violated, as it is another improper response by Narricot

---

[21] The ALJ did not find that Beals actively solicited employees to resign their membership in the Union. (Decision at 13.) As with many of the alleged violations, Narricot improperly responded to employee requests for information as to how they could be free of the Union.

[22] See supra note 21.

[23] Although she discredited testimony by an employee who stated that Hayes promised that the employees would receive a raise if they signed the petition, the ALJ also found that it was "not implausible" that Hayes may have casually directed employees to the petition, and credited the testimony of an employee who indicated that Hayes opined that if the employees got rid of the Union, they "ought to get more money." (Decision at 19.)

15

to the employee-led effort to remove the Union.[24]

### B. Whether Injunctive Relief is Just and Proper

Having concluded that there is reasonable cause to believe that Narricot violated the Act, the court now moves to the next step of the analysis and considers whether injunctive relief is just and proper in this case. See Aerovox, 389 F.2d at 477. The court concludes that it is not.

First, after a thorough review of the record, the court finds that the testimony of Lewis, Vaughan, and McGee makes clear that there was a substantial, employee-led effort to remove the Union which was separate and apart from any unlawful conduct by Narricot. Based on the testimony before the ALJ, at least five Narricot employees, not including Baumann, circulated the petition to decertify the Union. (See Tr. 536.) This effort was free from any significant involvement by Potter or Narricot.[25]

---

[24] See supra notes 21-22 and accompanying text.

[25] It appears that the only role that Potter played in this effort was in providing Vaughan with the initial blank petition, which Vaughan then copied, in telling Vaughan how many signatures were necessary to decertify the Union, and in receiving signature pages from Vaughan "once or twice." (Tr. 525-29, 535-37.) Unlike the ALJ's findings with respect to Potter's involvement in Baumann's decertification effort, it is clear from the record that Potter did not tell Vaughan that more signatures were needed, or that he was doing a "good job." Potter's responses with respect to Vaughan's decertification effort do not appear to rise above that of "ministerial aid." In determining the propriety of injunctive relief, the court does not need to definitively resolve this question. However, the facts of Vaughan's activities, including Potter's responses thereto, are necessary to know in order to fully assess the origin of the employee-led decertification effort.

However, it appears from the record that Narricot did impermissibly interject itself into the employee-led effort to decertify the Union. Accordingly, if Narricot contributed to the loss of majority support for the Union through its unfair labor practices, it cannot later rely on the decertification petition as a basis for refusing to bargain with the Union. See, e.g., NLRB v. Williams Enters., 50 F.3d 1280, 1288 (4th Cir. 1995). The question facing this court is whether the imposition of an affirmative bargaining order, which is essentially what the petitioner seeks, is an appropriate means of interim relief pending final resolution of this matter by the Board.

There are two primary interests at stake which may suffer irreparable harm. First, the petitioner correctly points out that the petition is brought to preserve the integrity of the collective bargaining process. See, e.g., Bloedorn v. Francisco Foods, Inc., 276 F.3d 270, 301 (7th Cir. 2001). Second, the employees who do not want to be represented by the Union, including those who worked in earnest to remove it, will suffer irreparable harm if this court orders reinstatement of a Union which a majority of Narricot's employees do not wish to represent them.[26]

These facts are relevant to the court's determination of the status quo which existed prior to the alleged violations by Narricot.

[26] The court is not persuaded by Narricot's argument that it will suffer irreparable harm if ordered to rescind the changes to wages, benefits, and job duties implemented after recognition was withdrawn from the Union. If the court were to characterize this

17

The purpose of a § 10(j) injunction is to restore the status quo pending final resolution of the unfair labor complaint by the Board.   See Townsend Culinary, 22 F. Supp. 2d at 484 (citing Aerovox, 389 F.2d at 477).   The petitioner argues that Narricot cannot rely on the decline in Union membership, from forty-five percent to twenty-four percent in two years,[27] and dues deduction authorizations as a "post hoc" justification for its withdrawal of recognition.   The petitioner is correct that the question of "majority support" is viewed by the Board as whether a majority of employees support Union representation, and not whether they are actually Union members; therefore, the Board does not consider a decline in Union membership to be a significant factor in assessing the amount of "support" for a Union.   See, e.g., Atlanta Hilton & Tower, 278 N.L.R.B. 474, 480 (1986).   However, the amount of support for the Union, including support expressed through Union membership, is relevant to this court's determination of the status quo which existed prior to Narricot's unlawful conduct, because preservation or restoration of the status quo is the purpose of a

---

rescission as an irreparable harm, this essentially would permit any employer who unlawfully withdrew recognition from a Union and subsequently implemented changes to the terms and conditions of employment, even if beneficial, to hide behind its unlawful conduct by asserting that an interim remedy would impose irreparable harm. However, insofar as rescission of these changes will effect undue hardship on Narricot's employees, the court considers this factor in determining whether interim relief is just and proper.

[27] See supra note 4 and accompanying text.

18

§ 10(j) injunction.  See Townsend Culinary, 22 F. Supp. 2d at 484

(citing Aerovox, 389 F.2d at 477).  Accordingly, the petitioner's

argument that Narricot is estopped from pointing to the nearly

fifty percent decline in Union membership is not persuasive at this

juncture, because this court must fully assess the landscape prior

to the alleged unlawful conduct by Narricot, not just at the time

of withdrawal of recognition from the Union.[28]

In making the full assessment of the situation surrounding the

Union's decertification, the strength of the causal connection

between any unlawful conduct by Narricot and the Union's loss of

support of the majority of employees is weak, based on the record

at this point.  This causal connection is ultimately required in

order for the Board to prevail on the merits of the underlying

claim.  See Americare Pine Lodge Nursing and Rehab. Ctr. v. NLRB,

---

[28] The petitioner's argument that Narricot cannot, ex post, rely on this as justification for its withdrawal of recognition from the Union, when it told the Union at the time of withdrawal that it was basing its withdrawal on the petition, may be applicable in the context of the underlying proceedings.  See, e.g., In re Miller Waste Mills, Inc., 334 N.L.R.B. 466, 469 (2001), enforced, 315 F.3d 951 (8th Cir.), cert. denied, 540 U.S. 811 (2003) ("In analyzing the adequacy of an employer's defense to a withdrawal of recognition allegation, the Board will only examine factors actually 'relied on' by the employer. . . . Conduct of which the employer may have been aware, but on which the employer 'did not base' its decision to withdraw recognition from the Union, is of 'no legal significance.'" (internal citations omitted)). However, at this juncture, it is not a dispositive factor under the just and proper standard being applied in determining the propriety of injunctive relief.

164 F.3d 867, 883 (4th Cir. 1999).[29]  It appears questionable that
the petitioner will ultimately be able to demonstrate that "the
unfair labor practice caused the decertification effort."   Id.
(emphasis added); see also NLRB v. Nu-S. Dyeing & Finishing, Inc.,
444 F.2d 11, 16 (4th Cir. 1971) ("An employer may avoid a
bargaining order by showing that the unfair labor practices did not
significantly contribute to such a loss of majority . . . ."); Lee
Lumber and Bldg. Material Corp., 322 N.L.R.B. 175, 177 (1996),
aff'd in part, remanded in part, 117 F.3d 1454 (D.C. Cir. 1997)
(noting that "there must be specific proof of a causal relationship
between the unfair labor practice and the ensuing events indicating
a loss of support" to invalidate a decertification petition).

    It is clear that the decertification effort originated with
Narricot employees, separate and apart, and well before, any
involvement or unlawful conduct by Narricot.  It is also clear that
support for the Union, both in the form of membership in the Union

----

    [29] A four-factor test is used to determine whether a
decertification petition is tainted by unfair labor practices, such
that the employer's conduct can be deemed the "cause" of the
petition: (1) the length of time between the unfair labor practice
and the decertification petition; (2) the nature of the employer's
illegal acts; (3) any possible tendency to cause employee
disaffection from the union; and (4) the effect of the unlawful
conduct on employee morale, organizational activities, and
membership in the union. See Americare, 164 F.3d at 882 (internal
citations and quotation marks omitted).  Given the record before
this court, it is doubtful that Narricot's conduct, which occurred
after the manifestations of employee disaffection and after the
decertification effort commenced, can properly be deemed the
"cause" of the petition.  See infra discussion at 20-23.

and support for Union representation generally, was waning prior to Narricot's unfair labor practices.[30]  Because it is not possible to determine exactly how much of the decertification petition was "tainted" by Narricot's impermissible participation, and because it is clear that a substantial number of signatures[31] was obtained free from any involvement by Narricot, an order revoking the decertification effort would neither serve the remedial purposes of the Act nor properly restore the status quo.  See Townsend Culinary, 22 F. Supp. 2d at 484 (citing Aerovox, 389 F.2d at 477).

In short, the court does not find that injunctive relief is just and proper.  This is not a situation in which an employer undermined support for a newly certified, fragile Union.  Cf., e.g., Exxel/Atmos, Inc. v. NLRB, 28 F.3d 1243, 1248 (D.C. Cir. 1994) (noting that "in some circumstances [a] decertification bar may be necessary to insulate a fragile union from employer

---

[30] See supra note 4 and accompanying text.

[31] This court is satisfied that the signatures collected by Vaughan, Lewis, McGee, Travis Murphy, and the employee referred to by Vaughan during his testimony before the ALJ as "Candace," were not tainted by unlawful conduct on the part of Narricot.  (See Tr. 528-29, 536.)  The ALJ did not address this point, other than to state that "not all of the signatures on the petition [were] tainted by [Narricot's] unlawful assistance and support." (Decision at 27.)  As noted, this court is not charged with issuing an ultimate determination of whether Narricot "caused" the decertification effort.  While the Board may not require proof of how many employees were exposed to, or were aware of, an employer's unlawful conduct, see House of Good Samaritan, 319 N.L.R.B. 392, 396 (1995), this factor is relevant to this court in determining whether extraordinary relief, in the form of a § 10(j) injunction, is necessary to restore the status quo.

interference," and that this remedy "has the effect of ensconcing the union as the employees' exclusive bargaining representative and therefore carries with it the potential of infringing upon employees' Section 7 rights"). In contrast, the Union represented the unit for over thirty years. Prior to any unlawful conduct by Narricot, the employees were dissatisfied with the Union, which they felt had not done anything for them in recent years. (See Tr. 181, 491-92, 526.) The presence of the employee intervenors in this action in opposition to the imposition of an injunction, as well as the facts in the record which show that the employees, not Narricot, initiated the effort to remove the Union, have convinced the court that imposition of an injunction mandating the recognition of the Union would not be just and proper. It would unduly infringe on the § 7 rights of those Narricot employees, including the employee intervenors,[32] who have expressed a clear desire not to be represented by the Union. See Baltimore Sun Co. v. NLRB, 257 F.3d 419, 426 (4th Cir. 2001) ("[Section 7] guards with equal jealousy employees' selection of the union of their choice and their decision not to be represented at all."). It

---

[32] Vaughan has over thirteen years' experience at Narricot, and was a member of the Union for the three to four years leading up to the decertification effort. Lewis has been employed at Narricot for over twenty-four years, and was a member of the Union until approximately two years before the decertification effort. The substantial experience of the employee intervenors with both Narricot and the Union warrants deference to their expressed disaffection.

22

would not be just and proper, in essence, to punish the employees

for their employer's <u>subsequent</u>, but impermissible, involvement in

their decertification effort.[33]

### IV. Conclusion

For the reasons set forth above, the petition for injunctive

relief is **DENIED**.   The Clerk is **DIRECTED** to send a copy of this

Memorandum Opinion and Order to counsel for the parties.

IT **IS SO ORDERED**.

/s/
Rebecca Beach Smith
United States District Judge

Rebecca Beach Smith
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia

July 24, 2008

---

[33] As noted, the purpose of § 10(j) is to restore the status quo pending the lengthy administrative process.  At this stage in the litigation, the ALJ has rendered her decision, and, presumably, exceptions and responses have been filed with the Board.  The administrative process is nearly complete, and "the expedience with which the ultimate remedy is attained is within the sole discretion of the Board."  <u>Fieldcrest Cannon</u>, 1994 WL 1027520, at *5-6; <u>see also</u> <u>Johnston v. J.P. Stevens & Co.</u>, 341 F.2d 891, 892-93 (4th Cir. 1965).   Accordingly, the court finds that the need for an extraordinary remedy in the form of a § 10(j) injunction is greatly reduced.  <u>See</u> <u>Fieldcrest Cannon</u>, 1994 WL 1027520, at *5-6 (noting that "it is the issuance of the complaint, not the issuance of the decision of the Administrative Law Judge, which triggers the right to seek injunctive relief," and declining "to find the potential delay in Washington to be a reason for the court to enter injunctive relief").